## YOUNG v. McKAY.

*(Circuit Court, N. D. California. April 18, 1892.)*

NATIONAL BANKS—STOCKHOLDER'S LIABILITY—TRANSFER OF CERTIFICATES.

In an action by the receiver of a national bank to enforce an assessment under Rev. St. § 5151, against one credited on the transfer books as a stockholder, it appeared that nearly a year before the failure he had sold his stock to a broker for an undisclosed principal, that he indorsed the same, and requested the broker to inform the cashier of the transaction, and to have the stock transferred; that the broker accordingly handed the stock to the cashier, gave him the necessary information, and requested him to make the transfer. This the cashier promised to do, but in fact the transfer was never made. The certificate recited that it was transferable on the books of the company "by indorsement hereon and surrender of this certificate." *Held*, that in requesting the cashier to make the transfer the broker acted as the seller's agent, and that the latter did all that was required of him as a prudent business man, and could not be held liable as a stockholder. *Whitney* v. *Butler*, 7 Sup. Ct. Rep. 61, 118 U. S. 655, followed. *Richmond* v. *Irons*, 7 Sup. Ct. Rep. 788, 121 U. S. 27, distinguished.

At Law. Action by S. P. Young, as receiver of the California National Bank of San Francisco, against McKay, as a stockholder, to recover an assessment on certain stock. Judgment for defendant.

*A. R. Cotton*, for plaintiff.

*Edward R. Taylor* and *John R. Jarboe*, for defendant.

HAWLEY, District Judge, *(orally.)* This is an action brought by the receiver of the California National Bank of San Francisco to recover the amount of an assessment levied by the comptroller of the currency at Washington upon 50 shares of stock alleged to be owned by the defendant. On the 20th day of October, 1886, the defendant subscribed for 100 shares of stock. On the 4th day of November he paid the first installment of $2,500 on 50 shares. The other 50 shares were then transferred by him upon the books of the bank to R. P. Thomas, the president of the bank. On January 6, 1887, he paid the second installment on 50 shares, and on April 18th he paid the final installment of $500, making in all the sum of $5,000, the par value of the stock. He held and owned the certificate for this 50 shares of stock until the 1st of January, 1888, when he sold it to S. R. Noyes for $6,000. At the time of the sale the bank was solvent, doing a good business, and its stock was above par, selling in the open market at a premium of $20 per share. The defendant, in detailing the facts concerning this sale of his stock, said that Mr. Noyes, a broker, came to his office and asked him if he had any shares of stock for sale; that he replied that he had, and asked $120 per share for it; that Mr. Noyes bought the 50 shares of him, and paid him $6,000 therefor; that he then indorsed the certificate, and handed it to Noyes, and said that he would go with him to the bank, and have the certificate transferred; that Noyes said that it was unnecessary to take that trouble; that he would attend to it himself, and have it transferred; that defendant then requested Noyes to inform the cashier of the bank that he had no longer any interest in the stock, and to be sure and have the certificate transferred. Mr. Noyes' testi-

mony as to what occurred at the time of the sale is the same as given by the defendant. He further testified that he took the certificate to the bank, and informed the cashier that it was McKay's stock; that McKay requested that the certificate be transferred; that the cashier took the certificate, and said that he would attend to it,—that it was all right. In purchasing the stock, Mr. Noyes acted as broker for an undisclosed principal. His connection with the transaction can be briefly stated. Mr. Ramsden, who was the cashier of the bank, met him on the street, and requested him to get the stock from McKay, and assured him that, if the stock was procured, he could make a brokerage on it. Ramsden gave him the money to purchase the stock, and requested him to bring the certificate to the bank, which he did. Ramsden also confidentially told him that the stock was for R. P. Thomas, the president of the bank. On December 17, 1888, 11 months after the transaction, the bank suspended. The certificate for the 50 shares of stock was canceled on the 5th of January, 1889, 19 days after the failure of the bank. On the 14th of January, 1889, S. P. Young was appointed receiver of the bank by J. D. Abrams, deputy and acting comptroller of the currency. On the 18th of January, the comptroller of the currency levied an assessment of $37.50 upon each share of the capital stock, and directed the receiver to enforce to that extent the individual liability of the shareholders.

Upon the facts above stated, is defendant, McKay, liable as a shareholder for the assessment upon said 50 shares of stock? The United States statute provides that the capital stock of each banking association shall be deemed personal property, and shall be transferable on the books of the association in such manner as may be prescribed by the by-laws of the association, and that every person becoming a shareholder by such transfer shall, in proportion to his shares, succeed to all the rights and liabilities of the prior holder of such shares. Rev. St. § 5139. It is also provided that the shareholders shall be held individually responsible, equally and ratably, for all contracts, debts, and engagements of the association, to the extent of the amount of their stock therein. Section 5151. The by-laws of the California National Bank declare that—

" Certificates of stock shall be signed by the president and cashier, and shall state upon their face that the stock is transferable only upon the books of the bank. When transferred, the certificates thereof shall be returned to the bank, and canceled, and new certificates issued. Every issue and transfer of stock shall be entered upon a book to be kept for the purpose, which shall show the date of issue, whether an original issue or one by transfer, and, if the latter, in place of what stock issued, the name of the present owner, and such matters as may be necessary to give a complete history of the ownership of the stock."

As a general rule, deducible from all the authorities bearing directly upon the question under consideration, it may be safely stated that, in all cases between the creditors of a bank and the person standing on the books of the bank as a shareholder, the person who allows his name to remain on the books of the bank as a shareholder is estopped from denying that he is a shareholder, and that his individual liability to the

creditors continues after he has made a *bona fide* sale of his stock until the transfer of the stock is entered on the books of the bank, and that such transfer cannot be made, as against creditors, after the bank is known to be insolvent.

In *Richmond* v. *Irons*, 7 Sup. Ct. Rep. 788, 121 U. S. 27, the supreme court of the United States said :

"As to the 50 shares of stock sold by Comstock to Holmes, September 23, 1873, we think the conclusion cannot be resisted that the transaction was made in contemplation of the insolvency of the bank, and, although both parties may have believed that the bank would ultimately be able to pay all of of its debts notwithstanding this transaction, we think that, as against creditors, it was fraudulent in law, and to that extent Comstock is chargeable as a shareholder. The sale of 50 shares in February, 1873, and of the other 50 shares in June, 1873, there is no reason to suppose were not made in entire good faith, and without any expectation on the part of the parties of the insolvency of the bank. Notwithstanding that, Comstock continued to be, upon the books of the bank, the owner of these shares until September 23d and September 24th, when they were respectively transferred. By section 5139 of the Revised Statutes, those persons only have the rights and liabilities of stockholders who appear to be such as are registered on the books of the association, the stock being transferable only in that way. No person becomes a shareholder, subject to such liabilities and succeeding to such rights, except by such transfer. Until such transfer, the prior holder is the stockholder for all purposes of the law. It follows, therefore, that Charles Comstock, in respect to the shares sold by him in February and June, 1873, was the statutory owner on the 23d day of September, 1873. His liability as such stockholder is the same as if he had that day sold and transferred the stock to Ira Holmes, but such a sale and transfer could only have been made that day by Comstock, who was himself a director, in contemplation and actual knowledge of the suspension of the bank. It would operate as a fraud on the creditors,— an effect which the law will not permit. The case is not within the rule laid down in *Whitney* v. *Butler*, 118 U. S. 655, 7 Sup. Ct. Rep. 61. Here there is no proof, as there was in that case, of the delivery of the certificates to the bank, and the power of attorney authorizing its transfer, with a request to do so made at the time of the transaction. The delivery was to Holmes, not as president, but as vendee. We are therefore constrained to hold that the decree below, in charging Comstock with liability as the owner of 150 shares, was not erroneous."

In *Whitney* v. *Butler* the court, after stating the general rule, said :

"But it will be found, upon careful examination, that in no one of the cases upon which these general principles have been announced, as between creditors and shareholders, does it appear that the precaution was taken, after the sale of the stock, to surrender the certificates therefor to the bank itself, accompanied (where such surrender was not made by the shareholder in person) by a power of attorney, which would enable its officers to make the transfer on the register. The position of the seller, in such a case, is analogous to that of a grantor of a deed deposited in the proper office to be recorded. The general rule is that the deed is considered as recorded from the time of such deposit. 2 Washb. Real Prop. bk. 3, c. 4, par. 52. Where the seller delivers the stock certificate and power of attorney to the buyer, relying upon the promise of the latter to have the necessary transfer made, or where the certificate and power of attorney are delivered to the bank without communicating to its officers the name of the buyer, the seller may well be held liable as a shareholder until, at least, he shall have done all that he reasonably can

do to effect a transfer on the stock register. In the case before us the personal presence of the defendants at the bank was not required, in order to secure their release from liability as shareholders. Besides, the certificate of stock authorized them to act by attorney. Through their agents, the brokers who sold the stock, and through whom they received the money paid for it, they surrendered the certificates and power of attorney to the president of the bank; he receiving them with knowledge not only that defendants had parted with all title to the stock, and had been paid for it, but also that it had been purchased at public auction by Eager. He knew equally well that the surrender of the certificates and the delivery of the power of attorney and the certificate from the probate court could only have been for the purpose of having it appear, by means of a transfer on the books of the bank, that Whitney's executors were no longer shareholders. The right to have the transfer made, and thereby secure exemption from further responsibility, was secured to the defendants, both by the statute and by the by-laws of the bank. They did all that was required by either as preliminary to such transfer. Nothing remained to be done except for some officer of the bank to make the necessary formal entries on its books. If, when the agents of defendants delivered the certificates and power of attorney to the president of the bank, the latter had given an intimation of a purpose not to make the transfer promptly, or had avowed an intention to postpone action until a sufficient amount of stock was obtained to fill Coburn's order, it may be that the failure of the defendants to take legal steps to compel a transfer would, in favor of the creditors of the bank, have been deemed a waiver of the right to an immediate transfer on the stock register. But no such intimation was given; no such avowal was made. No objection was made to the power of attorney, or to the discharge of the defendants from liability. So far as the record shows, nothing was said or done by the bank's officers to raise a doubt in the minds of the defendant's agents that the transfer would not be made at once. It was suggested in argument that the defendants should have seen that the transfer was made. But we are not told precisely what ought to have been done to this end that was not done by them and their agents. Had anything occurred that would have justified the defendants in believing, or even in suspecting, that the transfer had not been promptly made on the books of the bank, they would, perhaps, have been wanting in due diligence had they not, by inspection of the bank's stock register, ascertained whether the proper transfer had in fact been made. But there was nothing to justify such a belief or to excite such a suspicion. Their conduct was, under all the circumstances, that of careful, prudent business men, and it would be a harsh interpretation of their acts to hold (in the language in some of the cases, when considering the general question under a different state of facts) that they allowed or permitted the name of Whitney to remain on the stock register as a shareholder. We are of opinion that, within a reasonable construction of the statute, and for all the objects intended to be accomplished by the provision imposing liability upon shareholders for the debts of national banks, the responsibility of the defendants must be held to have ceased upon the surrender of the certificates to the bank, and the delivery to its president of a power of attorney sufficient to effect, and intended to effect, as that officer knew, a transfer of the stock on the books of the association to the purchaser." 118 U. S. 661, 7 Sup. Ct. Rep. 63–65.

If it be true, as is held in *Whitney* v. *Butler*, that the seller of the stock should not be held liable as a shareholder when it affirmatively appears that he has done all that a careful, prudent business man could reasonably do to effect a transfer on the stock register, and that it is a sufficient compliance of this rule if the seller of the stock has taken the precaution,

after the sale of the stock, to surrender the certificate to the bank, properly indorsed, with the request that the transfer be made on the books of the bank, then it must necessarily follow that, upon the facts presented in this case, the defendant cannot be held liable as a stockholder. But it is argued by plaintiff's counsel that the defendant does not come within the rule laid down in *Whitney* v. *Butler*, because the surrender of the stock was not made by him in person, nor was it accompanied by a power of attorney, which would enable the officers of the bank to make the transfer on the register. The transfer journal kept by the bank contains a heading in the following words:

"We, the undersigned, hereby sell, transfer, and assign so many shares of the stock of the California National Bank of San Francisco to the person whose name is set opposite our respective names, as per certificate surrendered and canceled."

It is contended that no person but the seller of the stock, or some one by him duly authorized by power of attorney, can lawfully write his name in this book. It is true that, in *Whitney* v. *Butler*, there was a regular power of attorney executed by the sellers of the stock. But the certificate in that case—evidently prepared so as to conform to the by-laws of the bank—contained the following words: "Transferable only on the books of said bank in person or by attorney, on surrender of this certificate." The certificate in this case is radically different. It contains the following words: "Transferable on the books of the company by indorsement hereon and surrender of this certificate." An inspection of the transfer journal shows, as was testified to upon the trial, that some of the transfers were made in the handwriting of the bookkeeper of the bank. The certificate was properly indorsed, and it was delivered to an officer of the bank, with the verbal request of the seller that it be transferred on the books of the bank. The broker Noyes, in making this request, must, under the facts established in this case, be considered as the agent of the defendant for that purpose. It therefore affirmatively appears that the defendant did all that the statutes, or the by-laws of the bank, or the certificate, required him to do to have the transfer made. "Nothing remained to be done except for some officer of the bank to make the necessary formal entries in the books." This the officer agreed to do, and the certificate was left with him with the understanding that the transfer should be made to the purchaser, whom the officer knew was R. P. Thomas, the president of the bank. There is not, in my opinion, any conflict in the legal principles announced in *Whitney* v. *Butler* and *Richmond* v. *Irons*. The cases are simply distinguishable in their facts. Upon a careful consideration of all the facts established by the evidence in this case, and of the principles of law applicable thereto, as announced by the supreme court of the United States, I am of opinion that this case comes within the rule laid down in *Whitney* v. *Butler*, and that the defendant is not liable for the assessment levied upon the 50 shares of stock. Judgment will therefore be entered in favor of defendant for his costs.