## FREEMAN, receiver, *v.* JACKSON.

Under the evidence in the case, it was error for the court to direct a verdict in favor of the defendant.

OCTOBER 20, 1916.

Action upon stock assessment. Before Judge Wright. Walker superior court. August 18, 1915.

The First National Bank of La Fayette, Georgia, was placed in the hands of a receiver, and closed on July 19, 1913, by the comptroller of currency. T. C. Dunlap was appointed receiver, and on June 8, 1914, L. R. Freeman, was appointed to succeed him. Freeman as receiver brought suit to collect an assessment on the stock of the bank, alleging that at the time of the appointment of the receiver the defendant appeared on the books of the bank as the holder of 21 shares of the capital stock of the par value of $100 per share, and was at that time the holder or owner of these shares; that on April 29, 1914, the comptroller of the currency, in order to pay the debts of the bank, ordered an assessment, upon all its shareholders, of $75 for each share of the capital stock, which assessment was due on May 29, 1914; and that Dunlap as receiver, on April 29, 1914, notified the defendant, in writing, of the levy of the assessment. The defendant admitted that he was the owner of eleven shares, but refused to pay the assessment due on the re-

maining ten shares, denying that he was the owner of them.
Upon the trial of the case it appeared from the testimony adduced
by the defendant that he had been the holder of a certificate repre-
senting ten shares of stock in the bank, and that on April 29, 1913,
he sold and delivered the certificate to S. A. Hunt, who was then
the cashier of the bank, and told him to transfer it on the bank's
books. The assignment on the back of the certificate was left
blank, because, as the defendant testified, the purchaser, Hunt,
told him not to fill in the assignment, as his wife would probably
want the stock. The defendant at that time was acting vice-presi-
dent of the bank, and held twenty-one shares until he sold the ten
shares referred to. The defendant further testified that he did
not know the bank was in a failing condition at that time; did not
know the bank was not in good condition, until the examiner closed
it, though he had heard some criticism of the bank for a month or
more before it closed. He made no effort towards having the
stock transferred on the books of the bank. The sale was a bona
fide transfer. Defendant thought Hunt was personally solvent,
and that the bank was in the same condition. On the back of the
certificate representing the stock was the following endorsement:
"For value received I hereby sell, assign, and transfer unto
S....................shares of capital stock represented by the
within certificate, and do hereby irrevocably constitute and ap-
point .................... to transfer said stock on the books
of the within-named corporation, with full power of substitution
in the premises. Dated April 29th, 1913. T. A. Jackson."
Hunt, the purchaser of the stock, testified: "On April 29, 1913,
I was acting as cashier of the First National Bank of La Fayette,
Georgia, and had been so acting continuously since the organiza-
tion of the bank, about ten years in all. I bought the stock, as
evidenced by stock certificate No. 176, from T. A. Jackson; and he
transferred it to me on April 29th. He started to make the stock
payable to me, and, as he stated, I told him my wife might take
the stock, or probably some one else might take it; to leave that
blank. I gave him a check for it late one evening in the store
there, and went on home. I kept the stock-book of the bank, but
not all of the time. Mr. Dalton kept it some. It was the duty of
the cashier and president, or vice-president in the absence of the
president, to transfer stock when sold. No note was ever made on

the bank books of the transfer of this certificate of stock. The reason I never made the transfer, I simply never thought of it. We checked over these stock-books about every sixty days; if we found anything like that, we posted them back to their proper numbers and made the transfers. . . Mr. Dickerson was president of the bank, and was here at the time I purchased this stock. It was the president's and the cashier's duty to transfer the stock on the books of the bank. New stock would have to be issued and necessarily have to be signed by the cashier and the president. The cashier or assistant cashier kept the stock-books, and the president had nothing to do with them." At the conclusion of the evidence the court directed a verdict for the defendant, and the plaintiff excepted.

*Rosser & Shaw,* for plaintiff. *R. M. W. Glenn, Earl Jackson,* and *Maddox & Doyal,* for defendant.

BECK, J. (After stating the foregoing facts.) From the report of the case of Whitney *v.* Butler, 118 U. S. 655 (7 Sup. Ct. 61, 30 L. ed. 266), it appears that "A, an owner of shares in the capital stock of a national bank, employed a broker and auctioneer to sell them by public auction. They were bid off by B, who paid the auctioneer for them, and received from him the certificate of stock, with a power of attorney for transfer duly executed in blank. The auctioneer paid the purchase-money to A. B was employed by the president of the bank to make this purchase for a customer of the bank, who had made a deposit in the bank for the purpose, and he delivered the certificate and the power of attorney to the president, and received from the bank the money for the purchase. No formal transfer of the stock was made on the transfer-book of the bank. Shortly afterwards the bank became insolvent, and eventually went into the hands of a receiver, who made an assessment on the stockholders under the provisions of Rev. Stat. § 5205 [U. S. Comp. St. 1913, § 9767], to make up the deficiency in the capital. Until after the stoppage A had no knowledge as to the purchaser, or as to the neglect to formally transfer the stock, and no reason to suppose that the transfer had not been made." And it was there held: "That the responsibility of A ceased upon the surrender of the certificates to the bank, and the delivery to its president of a power of attorney sufficient to effect, and intended to effect, as the president knew, a transfer of the stock on the books

of the bank." The decision in that case was based upon the ground that after the sale of the stock the certificate therefor was surrendered to the bank itself, accompanied by a power of attorney which would enable its officers to make the transfer on the books, and that the position of the seller in the case was analogous to that of a grantor in a deed who had deposited it in the proper office to be recorded. We do not think that the facts in the case at bar bring it, in favor of the defendant, up to the case last referred to. For, while Hunt was the cashier of the bank and may have been authorized to make the transfer upon the books of the company, the delivery of the stock was to him as purchaser, or as agent for a purchaser in case Hunt's wife should desire the stock. The defendant in this case, who was the owner of the stock, testified that he told Hunt to make the transfer; and the court below may have treated this as uncontradicted testimony that he directed Hunt as the cashier to make the transfer. But pause for a moment to consider, to whom would the transfer have been made on the books of the bank at the time Jackson gave the alleged direction to Hunt? Would it have been to S. A. Hunt, or to his wife? We think that the case of Richmond *v.* Irons, 121 U. S. 27 (7 Sup. Ct. 788, 30 L. ed. 864), is a case more nearly in point, and upon principle rules the present case. In that case a party named Comstock sold his shares of stock in a national bank to one Holmes, the latter being president of the bank; and the court, after a statement of the facts of the case, ruled: "The case is not within the rule laid down in Whitney *v.* Butler, 118 U. S. 655. Here there is no proof, as there was in that case, of the delivery of the certificate to the bank and a power of attorney authorizing its transfer, with a request to do so made at the time of the transaction. The delivery was to Holmes, not as president, but as vendee. We are, therefore, constrained to hold that the decree below, in charging Comstock with liability as the owner of 150 shares, was not erroneous." A general statement of the principle covering such cases is found in the syllabi to that case and is in the following language: "A stockholder in a national bank continues liable for the debts of the company, under the statutes of the United States, until his stock is actually transferred upon the books of the bank, or until the certificate has been delivered to the bank, with a power of attorney authorizing the transfer, and a request, made at the time of the

transaction, to have the transfer made; a delivery to the president of the bank as vendee and not as president is insufficient to discharge the shareholder under the rule in Whitney *v.* Butler, 118 U. S. 655." See also Bolles' Nat. Bank Act Ann. 144 et seq.; 3 Michie on Banks, 1865 et seq.

Applying the doctrine laid down to the facts of the present case, we are of the opinion that the court erred in directing a verdict for the defendant.

*Judgment reversed. All the Justices concur.*